United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good morning, everyone. Welcome to the Ninth Circuit. I'm Judge Sung. I'm happy to be here with my colleagues, Judge McCune and Judge Fitzwater, who is visiting us from the Northern District of Texas, sitting by designation, and we really appreciate him giving us a helping hand this whole week. I'd also like to thank our excellent court staff, especially our courtroom deputy today, Ms. Dodds, and the following matters are submitted on the briefs. Serrano Osorio v. Bondi, Lopez Ramirez v. Bondi, Serrano Rios v. Bondi, and Contreras Porcayo v. Bondi, and we'll take up the remaining cases in the order they appear on the calendar. Good morning. May it please the court, I'm Vanessa Gutierrez with the Northwest Immigrant Rights Project. On behalf of the petitioners, Marisela Lopez Meraz and her minor daughter, I'd like to reserve two minutes of my time for rebuttal, if I may. Your Honors, Ms. Lopez Meraz fled Mexico to escape years of persecution and torture in the form of domestic abuse, including ongoing rape and threats at the hands of her husband. I'd like to focus my arguments today on the asylum claim in which the agency made two fundamental errors requiring reversal. First, it improperly imposed a requirement that members of her particular social group be unable to physically separate as a result of persecution, and second, it ignored substantial evidence showing the Mexican government's inability to protect Ms. Lopez from her husband. The agency impermissibly redefined Ms. Lopez Meraz's social group by misinterpreting what it means to be unable to leave a domestic relationship. Rather than recognizing this inability as encompassing various forms of constraint, the agency narrowly construed the social group. It found that Ms. Lopez Meraz's husband tracked, harassed, and threatened her despite her attempted relocation, yet it still found that she left the relationship because she was not harmed during these interactions. By making physical separation the determining factor, the agency erroneously treats a relationship as a physical location rather than recognizing it as a societally defined connection between individuals. This court in Díaz-Reynosa v. Barr found that the inability to leave a relationship can derive from societal, economic, and cultural factors, not simply from persecutory harm. Similarly, the Sixth Circuit in Juan Antonio v. Barr identified the error in making physical separation dispositive. It says, physical separation does not necessarily indicate that a relationship has ended. If it did, then any woman who escaped her persecutor and then filed for asylum would be denied. Let me ask a practical question. I understand that when she left, she didn't really leave in the sense that he stalked her and these phone calls and this continued. Yes, Your Honor. If we were to remand because of this misunderstanding of what it means to be in a domestic violence relationship, we have this more recent case by the Attorney General, SSFM, which was just issued maybe a month or two ago. I'm wondering, would the essence of that and the defining of particular social groups for private conduct, would that affect your client or are we back to a situation where the BIA accepted this social group and then go from there? I believe the BIA would have to consider the facts of this case in determining whether our client has met her burden of showing that she's part of this particular social group that she presented. They would consider that case, but that's not binding here. We believe that she would still meet her burden. Following up on Judge McEwen's question, understanding that this is a horrific circumstance given the record, where do we draw the line? It seems to me that this would open Pandora's box if we're saying that relief has to be granted here. Well, Your Honor, I believe that the line gets drawn at each individual case, right? So the facts is what is going to be the determining factor. And here, the facts in the record are sufficient to show that there was substantial evidence that she met her burden of showing membership in the particular social group. So I don't believe that it would open the floodgates. I think that each individual applicant would still have to prove that their facts meet the standard. And would that also apply to whether Mexico has the ability to address this concern? Yes, Your Honor. So there are cases where this court held that the government wasn't able to, or was able to protect, but that's not the case in this individual circumstance. Would you move to that? We have a situation where, as I understand it, she didn't report any abuse to the police, and that's not uncommon in domestic abuse cases, and also particularly her view in Mexico that that would not net any positive reaction. But she still needs to meet the finding about unable and unwilling. Would you address that? Yes, of course, Your Honor. So in this case, there is evidence in the record that it would have been to report. And we see that through the expert declarations talking about the widespread nature of domestic violence, which the agency acknowledges. We also see in her specific situation that there is evidence that her abusive husband was connected to a cartel group and had individual acquaintances or friends that were members of the government. And that, coupled with the country conditions of widespread corruption, show that the government would be unable and perhaps even unwilling to protect her. We can also look to the efficacy of the domestic violence laws. The agency makes a finding that because there is laws in Mexico that protect survivors of violence, that that's sufficient to show that she'd be protected. But that's not necessarily the case here. If we look to the one statistic that the agency cites, saying that 71% of domestic violence cases result in guilty verdicts. However, it doesn't acknowledge necessarily the fact that that's only about 1,500 total cases in Mexico. And it does, on the alternative side, acknowledge that domestic violence continues to be widespread. And that in and of itself shows that they would be unable or unwilling to protect her. So for example, Madrigal v. Holder is informative in that it says that a single statistic out of context that gives it a contrary meaning does not counter the record evidence. And that's what we have here. In that case, the court found that the lack of state ability to control Los Cetas in that case, when the BIA cited various statistics on the efforts of the Mexican government to combat drug violence in that case, but it didn't examine the efficacy of those efforts. And that's again what we have here. We have country conditions evidence that shows that in most cases women do not file domestic violence complaints due to, among other things, fear of re-victimization by state agencies that blame victims and corruption within security forces. I know that we have cases that say you don't need to report to government authorities in order to establish inability. But I guess as you mentioned, but then the BIA says there's no evidence that police would not have aided her. How do we measure that with substantial evidence and how do we fold that into a finding about unable and unwilling? Yes, Your Honor. So we would look to the country conditions evidence, the expert declarations in this case that all point to the fact that laws by themselves aren't sufficient to show that the happening in the country. And again, the agency finds that domestic violence is widespread. We have willingness and ability, and the BIA did deal with willingness, correct? But not ability? Yes, but we only need to have shown one, right? And even for the sake of argument, we say that they were willing, there's sufficient substantial evidence in the record that shows that they were unable. So we, you know, we can look to the declaration of Alicia Elena Perez Duarte, who was herself appointed government official to address domestic violence in Mexico, and she resigned that position under protest because the situation on the ground was that domestic violence was not taken sufficiently seriously. And that in and of itself also shows the enormous social and cultural tolerance of gender-based abuse, resulting in virtual complicity of authorities, and that's in her declaration at 323 in the record. It further supports this conclusion in her declaration that there's state encouragement of reconciliation instead of pressing charges. There's police corruption. Rape itself, which is something we have here, is rarely reported due to the ineffective authorities, social stigma, fear of retribution, and the fact that prosecution is unlikely. So where there's, under Colby Holder, there is indication that the agency didn't consider all the evidence before it, a catch-all phrase doesn't suffice. And so that's what we have here. They're saying, yes, we weighed the evidence, we looked at the evidence, but they omitted highly probative facts, and ignoring that they themselves find that the husband was, you know, attempting to locate her. Up until one month before her merits hearing, he, during a phone call, he calls and says, even if you hide under a rock, I will find you. And that shows that he believes that he, you know, will have free range if she returns. He also conditions divorce on her returning to Mexico, so an attempt to show, to lure her back. And there's a Hernandez case that, you know, talks about the dynamics of domestic violence and how they don't have to be physical abuse. They don't, there's lots of power and control happening here that applies in this case. Turning back to Hernandez v. Ashcroft, it states that non-physical actions rise to the level of when tactics of control are intertwined with the threats of harm in order to maintain the perpetrator's dominance through fear. And that, I believe, is what is happening here. I want to point the court to one more important piece of evidence in the record, which is the declaration of Professor Nancy Lemon, which this court has recognized as an expert in domestic violence. She's a leading authority on domestic violence and that she provides, you know, fact-based research evidence on what constitutes domestic violence. And the agency failed to look at those factors here and instead made assumptions about what Mexican society would determine is, is or is not, the ability to leave a relationship. Would you go back to the Mexican government allegations? I understand all the evidence, the experts' evidence, the reality of on the ground in Mexico, but does that mean that in every case that the Mexican government is unable to protect or prevent gender bias, gender discrimination? No, Your Honor. So it, it means just that in, in the, in when those societal factors coupled with the facts of a, of any given case show the inability of the Mexican government to protect or prevent gender discrimination, then the court... What, what distinguishes her case from others? That's what I'm trying to understand. What's the, either the limiting or the expansive factor that we look at in trying to determine the inability of Mexico? So in, in, in her case, there is evidence that her abusive partner has ties to cartel groups and government officials. That coupled with the country conditions evidence of widespread domestic violence and examples of police corruption show sufficient, sufficiently that there's substantial evidence in the record that in this particular case, that there wouldn't be an ability to protect. And with that, I see I'm at time. Thank you. Go ahead. Your microphone is muted. No, sorry. We're having a minor tech issue. We tested. I know, it's all right. It just needs to turn on in some way. No, Kwame. Oh. The issue is definitely on that side. Can you hear us? Okay, that's one. We just can't hear you. We're 50% there. You somehow are muted. I think he's showing us that he turned on his mic. Yeah, I don't see the mute sign. It looks like it's on that side. It's good on your system, but we're still not getting you. If your tech is there, maybe a reconnect. No tech. Should we? Yeah. If it's all right, maybe we'll give you a few minutes to resolve this. Then we'll move to another case until you get resolved. You could go to the next one. There we go. Excellent. Okay. All right.  No worries. All right. Excellent. My apologies, your honors. No worries. Where were we? May it please the court. Andrew Nzinga on behalf of the attorney general. To begin largely where petitioner leaves off, the record does not compel reversal of conclusion that the Mexican government would be unable or unwilling to protect her from the attackers. This case is strikingly similar to this court's decision of Velasquez Gaspar, which quoted Bringis Rodriguez that says that the record must conclusively show that the records would not have aided the applicant if they had reported the criminality. Here, there is no direct evidence about what the police would or would not have done because petitioner did not leave it. So we are largely left, well, no, we are solely left discussing country conditions evidence. To go to Judge McEwen's point about why would this not be essentially every case being unable and willing, the answer is it would be. Because petitioner can point to the fact that her husband once played music for a gang. That's the extent of the specific gang involvement. He may have played some music once for a gang. But at the end of the day, petitioners just simply rely on essentially very broad and generic allegations, some of them about domestic violence, but many of them simply about very generic human rights population, human rights violations, and very generic criminality concerns. This court obviously is well aware that it has cases involving where, say, criminals claim that the Mexican government is going to persecute them because they're criminals. So yet the court is always faced with this back and forth in these cases. In cases where the alien or applicant is a criminal, well, the Mexican government is fascist and totally able, they're going to search them out and find these criminals. Yet in cases where they don't, where the applicant wants to suggest essentially the government of Mexico is just an incompetent, keystone cops group of people. But the record obviously is much more complicated than that. The immigration judge recognized that there is corruption in Mexico, as there are in many countries, perhaps every country, that they recognize that there is ongoing criminality. But just as in Velasquez Gaspar, which dealt with Guatemala, the Mexican government has taken distinct steps. Now, of course, petitioner just waves the hand and says, ah, that's just legislative hope. Well, perhaps we should give legislatures a bit more credit than simply passing laws out of hope. They are trying to make concrete and they have made concrete changes. The Mexican executive branch has made concrete changes. They increased monitors of femicide, 17 centers for women, and specifically a program to assure home state of Guerrero. Now, again, just wave that aside and say, oh, none of that matters because criminality. Well, but again, we have to remind ourselves that as the Supreme Court reminded all the courts and the parties that the record must compel reversal in these cases. And the record does not compel the conclusion that Mexican government would be unable, would have been, or will be unable or unwilling to protect petitioner from her husband's abuse. Petitioner largely in the brief relies on the mere fact that she's credible. But again, Ming Dai emphasizes that the mere fact that a witness is or is not, is credible doesn't mean that a fact finder, any of this would be true about a jury, must find everything they say adequate to meet a burden of proof. So again, we're left with pretty generic country conditions and evidence where the immigration judge relied on substantial evidence of the Mexican government passing specific laws, putting in place programs to aid victims of domestic violence. So what are we supposed to do when the same reports that the IJ relied on, you know, referring to these programs in the next sentence says the programs are largely ineffective? Well, with respect, I don't think they're largely ineffective. I'm not sure exactly what specific part of the record. But this court recognized in Velazquez-Gaspar that programs will not necessarily be the maximally effective. And the fact that they're not, say, the most effective or as effective as we might hope they would be, does not mean the Mexican government or any government, in that case, Guatemalan government, would be unable or unwilling to protect the victims of crime. So I understand the government's concern that when the petitioner has not actually reported to the police, you know, they need some evidence to show government unwillingness and inability to protect them. At the same time, our precedent says they don't need to have to report to the police. So what, in your view, about your position, where would you draw the line? So how would a petitioner who hasn't reported to the police show futility? Well, I think as the agency and this court have outlined, you do have to present your left relying on country conditions evidence. It should be emphasized, of course, like, yes, someone doesn't have to report to the crime, and obviously the court's overruled its prior gap precedent. I suggest it's simply a null set. We have no idea how the police would have responded had petitioner called them. Simply, we don't know. So, but it is petitioner's burden of proof. And before this court, it's the petitioner's burden of persuasion to show that the record compels the conclusion. So there are cases, though, in any case where the petitioner doesn't report, we don't know for certain how the police would have responded, correct? So, and you're acknowledging that they would be left with relying on country conditions evidence. And then we have cases that say they don't have to report, they can show futility. So they're going to be relying on the type of evidence relied on here to show futility. Is that correct? The type of evidence, yes. Is your position that that's never going to be sufficient or that it can be sufficient in some cases? No, of course not. The attorney general's never suggested the evidence will never be sufficient. So what would be, what would the country conditions reports have to say to be sufficient? That is a good question. Largely, that has to be answered by a fact your honor. I can only answer to a degree, but it often becomes a difficulty that courts want to ask hypotheticals. And I understand that question. The difficulty is when we get in such fact intensive issues, that is a criminal case. Well, I'm asking because you're raising the parade of horribles of that if we, you know, that you're going to open the door to every single applicant getting, being able to show futility. So I'm asking, so I understand you want a limiting principle on the other side, when I'm asking what would be the limiting principle to say that there's at least some cases that they would be able to demonstrate futility. Well, first of all, your honor, I'm not trying to prod up, trot out a parade of horribles at all. We're just simply trying to say that when you look at just pretty generic evidence and say that record compels reversal, then that would essentially end the analysis and create, in fact, a more per se principle. But I guess the more generic and perhaps frankly unhelpful answer to your question is we're not asking for a principle. This is just a fact specific and a very, very factually intense question that's going to rely on the specific evidence before the court. And again, what petition relies on is fairly generic country conditions evidence. Some of it has nothing to do with domestic violence. Some is just about criminality. Some of it's just about human rights violations. But of course, in the country that's, I believe, about half the population of the United States, some of that's going to occur. But what the petition has to show is some relevance to her particular situation. And before the court, it's going to show that the record would have to compel any reasonable fact finder that must show that the Mexican government would be unable or unwilling to have protected her or will protect her. And although petition doesn't touch on CAD, I think it bears noting that that is essentially dispositive of petitioner's CAD application, as that would also go to the agency determination on acquiescence. Turning to the second and independently dispositive determination, the record doesn't compel that petitioner was and still is and will be in the group of Mexican women in domestic relationships that they are unable to leave. What this case reflects is obviously serious violent abuse that has declined as time went on. She left the marriage. Now, I guess that really is the crux of it, isn't it? Whether or not you're in the domestic relationship, essentially by petitioner notion, indefinitely. So what do we, what do you, how do you view the Sixth Circuit's decision in Juan Antonio versus Barr, where they said physical separation can't be the reason why you would say the petitioner is no longer in this PSG, because otherwise, by definition, every petitioner would not no longer be a member of PSG. And so what they talked about was, you know, that record showed that she was essentially unable to legally divorce her partner. And that, in that case, was meant she was still a member of the PSG. Well, I think what your Honor said about the legal, legally divorce is the most pertinent aspect of it. These, since the matter of ARCG came out, and since before, sorry, ARCG, if, you know, obviously we say ARCG here, the applicants have tended to try to formulate around that ball of cases. And that specific one in ARCG was married Guatemalan women unable to leave a relationship. And in the Sixth Circuit's case, it was defined by being married. So the applicant there apparently felt that her husband was motivated by the legal nature of the relationship. Petitioner, like many applicants, have sort of tried to modify it and then left off the married part of it. So one can obviously be married without cohabitating or being, in some sense of the word, domestic. But petitioner chose, represented by the same counsel all the time, to define it by domestic relationship. Petitioner has offered at no point in this litigation, from the beginning of the application on through the briefs, what does domestic mean? It's her burden of proof to say what a domestic relationship is. Absent any meaningful attempt, the agency did what any judge or adjudication did, just took the words out what they mean. A domestic relationship suggests some manner of cohabitation, some matter of, yeah, that sort of relation. She could have defined it, for example, by romantic relationship. She could have said parenting relationship. She added the adjective, not the agency. And if petitioner felt that domestic doesn't mean domestic, then her and her lawyer should have redefined it to the agency at some point, and she didn't. Let's just be practical about the facts of her particular situation. She's in a, we all agree she was in a relationship. She was married. She's being abused. She's being raped unwillingly by her husband. And she has a couple of alternatives. Stay the course and just continue being abused in situ, or try to leave, but she hasn't been able to terminate the relationship. It seems to me that a domestic violence victim is kind of between a rock and a hard place the way you define the options vis-a-vis asylum. No, Your Honor. It's simply not. The problem is that we can, in these cases, we can just focus on the severity of harm, and we will never get anywhere past it. And there is no way for me to stand here and say, hey, that's great. We're ever going to move past the severity. We can't. So there's no attempt to diminish the severity of the harm that has occurred here. And I appreciate you saying that. But what we have is a person who found out her husband was being unfaithful, moved in with her mom's house, and then her husband continued to contact her. And then she went to the friend's and he didn't go to her house. And then, even now, what she has said is that he calls to talk to his daughter. And fair enough, his daughter's been taken to a foreign country. Does he continue to make vague threats? Yes. But this really is about sort of our concern about severity of harm. But what we have to talk about is, is she still, maybe she's married, maybe he has multiple. On her deathbed, will she still be in a domestic relationship, unable to leave? Where's the end point of that? Well, if I understand you correctly, you're saying that this case is not similar to Juan Antonio simply because she didn't define the PSG by unable to leave a marriage because she used the term domestic relationship. Is that correct? And if she had said domestic violence victims unable to leave a marriage, then this case would be similar to Juan Antonio. Is that your argument? It'd be different. Petitioner, then, of course, the difficulty about modifying groups and never morphing them is then the whole nexus evidence changes, the cognizability analysis changes. That's why the agency- I'm just trying to understand your argument in response to my about Juan Antonio. Is that the reason why you're saying this case is different, that the fact that the Sixth Circuit distinguished between physical separation and divorce, and you're saying we can't draw that same distinction here because she defined the PSG based on domestic relationship instead of marriage? If I can answer your question, I seem out of time. In pertinent part, yes, because the marriage, they defined it by a legal relationship, but it does emphasize the Sixth Circuit doesn't say physical separation is irrelevant, and no one's defined this as simply saying physical relationship is the be-all and end-all. It's a broader analysis as the agency realized. So we'd ask that the court deny the petition. Okay. Thank you. Your Honors, briefly, I'd like to address Velazquez-Gaspar. That case is distinguishable from our case here. In that case, the court's findings hinged greatly on two issues. First, that there was a shelter in the individual's town. There's no such evidence in the record here. In fact, there's evidence that our client knows of no one who's been able to seek protection. And it also talks a lot about how there was acquaintances in that case that were urging the petitioner to seek protection, and that shows that the community believed that the government would protect her. And in this case, we know that she's even aware of individuals who've reported crime and were unable to seek protection. Secondly, I'd like to address the futility argument. Sorry, just where in the record does she say she knows people who actually reported crime and didn't seek help? Yes, just one second. I'll find that for you. It's in her testimony. Maybe what you could do is we used to have, maybe we still have these little sheets for kind of additional information. You could provide us with that citation electronically or through the clerk, making sure that counsel also has the advantage of that. Okay, will do. Do you want to go ahead and wrap up? Yes. And so, again, the court acknowledges that whether this is a domestic relationship, defined as a domestic relationship or a marriage, in fact, it is a marriage, but regardless, the country conditions, evidence, the expert declarations don't make a distinction in how society views a relationship between individuals and the situation of a couple. So that is, she properly defined her social group sufficiently enough to show that there is substantial evidence that she's a member of this particular social group. And there's also substantial evidence in the country conditions and expert declarations that the government would be unable to protect her. And with that, we ask that the court remand. Thank you.
judges: McKEOWN, SUNG, Fitzwater